# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DEANDRE J. TUCKER,

      Plaintiff,

v.

MICHAEL MEISNER, NICK SANCHEZ, CANDACE WHITMAN, JANE DOE, and COLIEN,

      Defendants.

Case No. 23-CV-853-JPS

**ORDER**

   Plaintiff Deandre J. Tucker, an inmate confined at Fox Lake Correctional Institution ("FLCI"), filed a pro se complaint under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights. ECF No. 1. This Order resolves Plaintiff's motion for leave to proceed without prepaying the filing fee and screens his complaint.

**1.  MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING THE FILING FEE**

   The Prison Litigation Reform Act ("PLRA") applies to this case because Plaintiff was a prisoner when he filed his complaint. *See* 28 U.S.C. § 1915(h). The PLRA allows the Court to give a prisoner plaintiff the ability to proceed with his case without prepaying the civil case filing fee. *Id.* § 1915(a)(2). When funds exist, the prisoner must pay an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He must then pay the balance of the $350 filing fee over time, through deductions from his prisoner account. *Id.*

   On July 11, 2023, the Court ordered Plaintiff to pay an initial partial filing fee of $48.33. ECF No. 5. Plaintiff paid that fee on August 4, 2023. The Court will grant Plaintiff's motion for leave to proceed without prepaying

the filing fee. ECF No. 2. He must pay the remainder of the filing fee over time in the manner explained at the end of this Order.

## 2. SCREENING THE COMPLAINT

### 2.1 Federal Screening Standard

Under the PLRA, the Court must screen complaints brought by prisoners seeking relief from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

In determining whether the complaint states a claim, the Court applies the same standard that applies to dismissals under Federal Rule of Civil Procedure 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899 (7th Cir. 2012)). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of this right was acting under the color of state law. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799

Page 2 of 14
Case 2:23-cv-00853-JPS    Filed 10/31/23    Page 2 of 14    Document 7

F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The Court construes pro se complaints liberally and holds them to a less stringent standard than pleadings drafted by lawyers. *Cesal*, 851 F.3d at 720 (citing *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015)).

### 2.2 Plaintiff's Allegations

Plaintiff names as defendants Warden Michael Meisner ("Meisner"), Captain Nick Sanchez ("Sanchez"), Health Services Manager Candace Whitman ("Whitman"), Jane Doe ("Doe"), and PSU Staff Colien ("Colien"). ECF No. 1 at 1. On August 24, 2022, Plaintiff was returned to FLCI by the Waukesha County Sheriff Department. *Id.* at 2. Plaintiff was put through the normal return procedure and reassigned to custody at FLCI. *Id.*

Plaintiff was escorted to Captain Schueler's office where he went through more procedure and was told that he would be placed in the Restrictive Housing Unit ("RHU") for the next five days for quarantine purposes. *Id* at 3. Plaintiff asked Schueler why he needed to be in RHU if he had a negative test and was not experiencing any symptoms. Schuler responded that it was institution policy and practice. *Id.* Plaintiff asked why he would be in RHU instead of the regular quarantine unit; Schueler responded the prior quarantine unit was being used for something else. *Id.* Plaintiff asked if he would be allowed to get items from his cell; Plaintiff was told he would not be allowed to do so and that he had to report directly to health services. *Id.* Plaintiff asked Schueler how it was that he was being placed in segregation and stripped of his property and privileges without having some type of disciplinary process. *Id.* Plaintiff said he had done nothing wrong to be punished; Schueler responded that it was because he had left the institution for more than twenty-four hours and would need to

test for COVID-19 and to quarantine. *Id.* Plaintiff told Schueler that the institution was violating his rights for property and canteen food items without valid cause. *Id.*

Upon arriving at health services, Plaintiff's vitals were taken and asked the standard COVID-19 questions. *Id.* Plaintiff responded that he was not experiencing any symptoms. *Id.* Plaintiff asked the nurse whether it mattered for quarantine whether he was vaccinated and boosted. *Id.* The nurse told Plaintiff that the only way he would not have to quarantine was if he had tested positive for COVID-19 within the last ninety days. *Id.* at 4. Plaintiff tested negative for COVID-19 in a rapid test, but he was told that he would still have to quarantine for the next ten days. Plaintiff told the nurse that he had been told he would only have to quarantine for five days, and he did not understand. *Id.* The nurse replied that there had been confusion among the administration and the information Plaintiff had received was wrong. *Id.* Plaintiff asked for the policy but was only told that Whitman made the decision. *Id.* Plaintiff wanted to know how Whitman could circumvent CDC guidelines on quarantine. *Id.*

Plaintiff inquired why inmates were not allowed to quarantine in the available rooms at health services, but the nurse would not give him an answer. *Id.* Plaintiff told the nurse how being subjected to this confinement could affect his mental health and attitude. *Id.* Plaintiff was told to write to psychological services about any mental health concerns but that he would likely not be seen until after his quarantine. *Id.*

Plaintiff was then escorted to HSU where he was handcuffed, and strip searched. *Id.* at 5. Plaintiff felt the search was excessive and intrusive because he had already been searched upon entry into the facility. *Id.* Plaintiff asked the officers about his personal property in his cell and

whether he would be able to access it. *Id.* The officers told Plaintiff that inmates in quarantine would not have access to their property or canteen in their cells. *Id.* Plaintiff claims it is against policy to prevent inmates in protective confinement from having access to their property. *Id.*

Plaintiff asked to speak with Sanchez about the policy because he felt like he was being punished worse than an inmate who would be in RHU for disciplinary separation. *Id.* Plaintiff was given a temporary lock up bag which consisted of property from his room that an officer had packed; he was given his toothbrush, toothpaste, one bar of soap, one lotion, and a deodorant. *Id.* at 6. Plaintiff wrote to Sanchez about being denied the rest of his property and canteen. *Id.* Sanchez came to talk to Plaintiff about the situation. Sanchez acknowledged that he understood Plaintiff's frustration but that unfortunately this was the solution the facility came up with to make sure inmates would quarantine. *Id.* Plaintiff told Sanchez this it was wrong to punish inmates who did not violate prison rules. *Id.*

Plaintiff told Sanchez that he did not eat most of the meals provided by the institution because he is intolerant to the ingredients and that he is allowed canteen as a general population inmate. Plaintiff said he needed access to his canteen so that he would not be famished during the ten days in RHU. *Id.* Sanchez told Plaintiff that the provided meals were nutritional enough and that refusing was Plaintiff's decision. *Id.* Plaintiff asked why other inmates had been allowed property and canteen when quarantined in 2020; Sanchez replied that the there was a different supervisor in charge at the time. *Id.* Plaintiff went back and forth with Sanchez about how this situation was unfair. *Id.* He also explained to Sanchez that he began to have physical pain due to sleeping on the concrete brick in his cell and a bad pillow; Plaintiff also told the nurse about this but was ignored other than

given some exercises. *Id.* at 9. Sanchez told Plaintiff to write to HSU about his medical problems. *Id.*

Plaintiff became depressed and upset that the institution was punishing him for leaving for a legal reason. *Id.* Plaintiff's mental state suffered during his quarantine, and he experienced a lack of sleep, he could not eat or digest food properly, and he experienced fatigue and massive headaches and received no treatment. *Id.* After his second day, Plaintiff began to experience thoughts of self-harm and he would press his intercom expressing a need to speak with psychological services. Plaintiff was told that he would not be seeing anyone in quarantine status. *Id.* Plaintiff had expressed to the nurse his first day that he was concerned how quarantine would affect his mental health, but he was never checked on. *Id.* The sergeant in the bubble would threaten to write Plaintiff a conduct report for pushing his intercom to seek help and Plaintiff stopped reaching out. *Id.* As a result, Plaintiffs began to self-harm by banging his head against the cell doors until he would get a migraine and would rip his hair from his scalp. *Id.* Plaintiff was not given any psychological services during the ten days even after he explained how urgent his need was several times. *Id.*

Health services conducted rounds every one to two days to check certain individuals for symptoms. *Id.* at 10. Plaintiff again interacted with Sanchez on Friday and questioned why he was being treated this way. *Id.* Sanchez explained this was a temporary solution until the institution project was completed. *Id.* That same day, Plaintiff told a nurse that he was experiencing neck pain due to sleeping on concrete brick and not having proper elevation for his neck; Plaintiff was denied a new pillow. *Id.* Plaintiff was asked if it was a new injury and he explained that it was from a previous accident in March 2021. *Id.* Plaintiff informed the nurse that he

needed Ibuprofen for his neck pain and refill of the medication; Plaintiff was told he would need to be seen for a refill and that he was not able to receive any pain relief. *Id.*

Following his release from quarantine, Plaintiff was much more depressed than before, he began to lose his appetite more frequently due to stress, and he had thoughts of suicide for how he was treated. *Id.* at 12.

### 2.3 Analysis

First, Plaintiff may not proceed on a Fourteenth Amendment claim for a deprivation of liberty without due process against any defendants. A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994)).

"A prisoner's liberty interest, and incumbent entitlement to procedural due process protections, generally extends only to freedom from deprivations that 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Lekas v. Briley*, 405 F.3d 602, 608 (7th Cir. 2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995)). In the absence of an "atypical and significant" deprivation, the procedural protections of the Due Process Clause are not triggered. *Id.* Disciplinary segregation can trigger due process protections. *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009) (citations omitted). When making the determination whether an inmate is entitled to such protections, courts analyze "the combined import of the duration of the segregative confinement and the conditions endured by the prisoner during

that period." *Id.* If conditions in segregation are significantly harsher than those in the normal prison environment, then a liberty interest may arise even when the duration of the segregation, standing alone, would not trigger such an interest. *Id.* at 697–98. On the one hand, "six months of segregation is 'not such an extreme term' and, standing alone, would not trigger due process rights." *Id.* at 698 (quoting *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995)). On the other end of the spectrum, transfer to a maximum-security prison and placement in segregated confinement for an indefinite duration where virtually all sensory and environmental stimuli are denied, little human contact is permitted, and prisoners otherwise eligible for parole are disqualified from parole eligibility, taken together, impose an atypical and significant hardship within the correctional context. *Id.* at 697 (citing *Wilkinson v. Austin*, 549 U.S. 209, 224 (2005)).

Once a liberty or property interest has been invoked, the Court looks to what process was due. Prison disciplinary hearings satisfy procedural due process requirements where an inmate is provided: (1) written notice of the charge against the prisoner twenty four (24) hours prior to the hearing; (2) the right to appear in person before an impartial body; (3) the right to call witnesses and to present physical/documentary evidence, but only when doing so will not unduly jeopardize the safety of the institution or correctional goals; and (4) a written statement of the reasons for the action taken against the prisoner. *See Wolff v. McDonnell*, 418 U.S. 539, 563–69 (1974); *Cain v. Lane*, 857 F.2d 1139, 1145 (7th Cir. 1988). Not only must the requirements of *Wolff* be satisfied, but the decision of the disciplinary hearing board must be supported by "some evidence." *Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir. 1994).

Here, the Court finds that Plaintiff did not have a liberty interest in avoiding the ten-day quarantine. Plaintiff alleges that he was denied his personal property and canteen during his ten-day quarantine to prevent the spread of COVID-19. The Court does not find these conditions alone, for a period of only ten days, show that Plaintiffs suffered an atypical and significant deprivation. The Court understands that Plaintiff may rightly feel that he was not treated fairly, however, a constitutional violation requires more than the short-term conditions imposed upon Plaintiff here. Prisons were put in extremely difficult positions during the COVID-19 pandemic and difficult decisions were necessarily made to protect both prisoners and staff from contracting a serious illness. Accordingly, based on the allegations in Plaintiffs' complaint, the Court cannot determine that Plaintiff had a protected liberty interest in avoiding the quarantine. As such, Plaintiff may not proceed on a due process claim at this time.

Second, the Court finds that Plaintiff may not proceed on an Eighth Amendment claim for deliberate indifference to his medical needs. The Eighth Amendment secures an inmate's right to medical care. Prison officials violate this right when they "display deliberate indifference to serious medical needs of prisoners." *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (internal quotation omitted). Deliberate indifference claims contain both an objective and a subjective component: the inmate "must first establish that his medical condition is objectively, 'sufficiently serious,'; and second, that prison officials acted with a 'sufficiently culpable state of mind,' i.e., that they both knew of and disregarded an excessive risk to inmate health." *Lewis v. McLean*, 864 F.3d 556, 562–63 (7th Cir. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations omitted)). "A delay in treating non-life-threatening but painful conditions

may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640).

Here, the Court finds that Plaintiff's allegations do not rise to the level of an Eighth Amendment deliberate indifference claim. Plaintiff generally references that he explained at the beginning of his quarantine that he was concerned about the state of his mental health and that no one checked on him. Plaintiff was told that he likely would not be seen during his ten-day quarantine for psychological services. These general allegations are not sufficient for the Court to determine that any defendants were deliberately indifferent to Plaintiff's serious medical needs. Plaintiff also alleges that he was not given pain medication during his ten-day quarantine to address an old injury in his neck; instead, he was only given some exercises for his pain. Absent a medical emergency, the Court is unwilling to find that the ten-day (or less) delay in pain medication alleged here rises to the level of a constitutional violation. Medical patients, prisoners and non-prisoners alike, experience delays in medical treatment on a regular basis and it is simply a necessary part of life for medical providers to triage medical emergencies. A reasonable wait is inevitable for medical treatment absent an emergency. Plaintiff affirmatively alleges that he received some treatment for his pain by receiving exercises. Disagreement between a prisoner and his medical provider, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment

violation. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). As such, the Court finds that Plaintiff's allegations here do not rise to the level of an Eighth Amendment claim.

The Court will, however, allow Plaintiff the opportunity to submit an amended complaint on or before **November 21, 2023.** When writing his amended complaint, Plaintiff should provide the Court with enough facts to answer the following questions: (1) Who violated his constitutional rights?; (2) What did each person do to violate his rights?; (3) Where did each person violate his rights?; and (4) When did each person violate his rights? Plaintiff's amended complaint does not need to be long or contain legal language or citations to statutes or cases, but it does need to provide the Court and each Defendant with notice of what each Defendant allegedly did or did not do to violate his rights.

The Court is enclosing a copy of its complaint form and instructions. Plaintiff must list all of the defendants in the caption of his amended complaint. He should use the spaces on pages two and three to allege the key facts that give rise to the claims he wishes to bring, and to describe which defendants he believes committed the violations that relate to each claim. If the space is not enough, Plaintiff may use up to five additional sheets of paper.

Plaintiff is advised that the amended complaint must bear the docket number assigned to this case and must be labeled "Amended Complaint." The amended complaint supersedes the prior complaint and must be complete in itself without reference to the original complaint. *See Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1056 (7th Cir. 1998). In *Duda*, the appellate court emphasized that in such instances, the "prior pleading is in effect withdrawn as to all matters not restated in

the amended pleading." *Id.* at 1057 (citation omitted). If the amended complaint is received, it will become the operative complaint in this action, and the Court will screen it in accordance with 28 U.S.C. § 1915A.

3. **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for leave to proceed without prepaying the filing fee, ECF No. 2, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the complaint fails to state a claim;

**IT IS FURTHER ORDERED** that Plaintiff may file an amended complaint that complies with the instructions in this Order on or before **November 21, 2023**. If Plaintiff files an amended complaint by the deadline, the Court will screen the amended complaint under 28 U.S.C. § 1915A. If Plaintiff does not file an amended complaint by the deadline, the Court will dismiss this case based on his failure to state a claim in his original complaint and will issue him a "strike" under 28 U.S.C. § 1915(g);

**IT IS FURTHER ORDERED** that the Clerk's Office mail Plaintiff a blank prisoner amended complaint form and a copy of the guides entitled "Answers to Prisoner Litigants' Common Questions" and "Answers to Pro Se Litigants' Common Questions," along with this Order;

**IT IS FURTHER ORDERED** that the agency having custody of Plaintiff shall collect from his institution trust account the $301.67 balance of the filing fee by collecting monthly payments from Plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to Plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this case. If Plaintiff is transferred to

Page 12 of 14

Case 2:23-cv-00853-JPS    Filed 10/31/23    Page 12 of 14    Document 7

another county, state, or federal institution, the transferring institution shall forward a copy of this Order along with his remaining balance to the receiving institution; and

**IT IS FURTHER ORDERED** that a copy of this Order be sent to the officer in charge of the agency where Plaintiff is confined.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2023.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

Plaintiffs who are inmates at Prisoner E-Filing Program institutions shall submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. Prisoner E-Filing is mandatory for all inmates at Columbia Correctional Institution, Dodge Correctional Institution, Green Bay Correctional Institution, Oshkosh Correctional Institution, Waupun Correctional Institution, and Wisconsin Secure Program Facility.

Plaintiffs who are inmates at all other prison facilities, or who have been released from custody, will be required to submit all correspondence and legal material to:

>Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>362 United States Courthouse
>517 E. Wisconsin Avenue
>Milwaukee, Wisconsin 53202

**DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS**. If mail is received directly to the Court's chambers, **IT WILL BE RETURNED TO SENDER AND WILL NOT BE FILED IN THE CASE**.

> Plaintiff is further advised that failure to timely file any brief, motion, response, or reply may result in the dismissal of this action for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. **IF PLAINTIFF FAILS TO PROVIDE AN UPDATED ADDRESS TO THE COURT AND MAIL IS RETURNED TO THE COURT AS UNDELIVERABLE, THE COURT WILL DISMISS THIS ACTION WITHOUT PREJUDICE**.